UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

RUBEN R. CRAIG III,

      Plaintiff,

      v.

ULI KLEMM, *et al.*,

      Defendants.

CIVIL ACTION NO. 3:26-CV-0992

(SAPORITO, J.)

## MEMORANDUM

Ruben Craig, a prisoner proceeding *pro se*, has filed a complaint (Doc. 1) against 77 defendants affiliated with the Pennsylvania Department of Corrections, asserting violations of the First and Fourteenth Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). For the following reasons, Craig will be permitted to proceed on First Amendment claims against five defendants who allegedly interfered with his legal mail or retaliated against him for filing grievances. However, his claims of improper restrictions on his religious practice are not properly joined in this case, and he must pursue those claims in a separate action.

## I. BACKGROUND

Craig's lengthy complaint describes a wide variety of incidents at

SCI-Benner Township ("Benner") and SCI-Smithfield ("Smithfield") from 2024 through the present. We first summarize a series of allegations about his medical care and other conditions of confinement, then address the bulk of Craig's complaint, which concerns the prisons' legal mail procedures and his access to the courts.[1]

### A. Administrative Custody

On March 31, 2025, Craig was assigned to work in the kitchen at Benner. He objected to the placement, telling staff that his "program codes and other factors precluded his placement in the kitchen at all prior institutions" and "that his safety and general well-being would be needlessly endangered by any such placement."[2] He made written and oral complaints about this placement to various supervisors, and the

---

[1] As noted, Craig also describes a variety of alleged restrictions on his religious practice. In brief summary, he alleges that he has been denied sacramental foods and other accommodations necessary to celebrate the Kiddush ritual; that he has been compelled to work on the Jewish Sabbath; that prison staff have failed to deliver extra food that he was supposed to receive in advance of religious fasts; and that he has been sporadically denied access to religious services.

For the reasons described below, these claims are not properly joined in this action and will not be addressed on their merits in this memorandum.

[2] Craig refers to "psychiatric and security issues," but does not offer a clear explanation as to why he could not work in the kitchen.

matter was ultimately referred to defendant "Harper[,] a CO-level guard and head of security," who approved the placement.

On April 22, Craig filed a grievance about the placement, which named Harper and other individuals involved. On April 25, Harper allegedly "order[ed Craig's] confinement in the [RHU]" pending an investigation. Craig does not explain the stated purpose of the investigation, if any. On May 1, he was taken to Harper's office, where Harper allegedly told him: "We're gonna keep this real short. You're being transferred [to another prison]. You overstayed your welcome here . . . we're tired of you and your grievances." Craig was eventually transferred from Benner to Smithfield and incurred more than $100.00 in costs to ship his property between the prisons.

### B. Conditions of Confinement

Craig asserts a variety of complaints about conditions of confinement at Benner and Smithfield, mostly related to his medical care. At Benner, various nurses allegedly enforced a policy that prisoners' medication must be floated, *i.e.*, placed in a cup of water and dispensed to the prisoners in that form. Craig alleges that he was prescribed medication that would dissolve if placed in water, and that a psychiatrist

had "place[d] a note in [Craig's] charts specifying that his pills are not to be floated." Craig claims that on three occasions in June and July 2024, he "questioned the need to float his pills and directed [nurses] to the note in his chart," but the nurses would only permit him to take the medication if it was floated, which Craig equates to being "denied" medication. The policy ended when a "medical supervisor" allegedly "issued a directive to all nurses that they are to stop requiring [inmates] to 'float' their medications."

Next, in February 2025, Craig was waiting in the medical department to have blood drawn. While another inmate was having his blood drawn, Craig observed phlebotomist Jane Doe #6 "touching [the inmate's] puncture site with her gloved hand and freely touching other surfaces that clearly had not been de-contaminated in a while." When his turn came, Craig asked Doe #6 to change her gloves; Doe #6 allegedly "became irritated," refused to change her gloves, and summoned guards to escort Craig from the room. Craig alleges that the same phlebotomist drew his blood in March 2025 under similar conditions, but Craig was "too cowed to ask her" to change her gloves because guards were present.

On an unspecified date in May 2025, defendants Ford and Jane Doe

#3 attempted to dispense medication to Craig through a "wicket," *i.e.,* an opening in Craig's cell door with a retractable cover. Ford was allegedly struggling to open the wicket, and Craig "asked Ford if he was having a problem with the wicket." Ford allegedly replied: "Oh, so you're refusing your meds, huh?" Craig denied this, but Ford allegedly "stopped all efforts" to open the wicket: "Yeah, you refused your meds; maybe you'll learn to keep your mouth shut in the future." Craig protested to Doe #3, but she was "unmoved." Separately, on June 2, 2025, Craig accidentally dropped a bar of soap into the toilet. He asked Ford for a new bar of soap, which Craig alleges was "standard practice in the RHU." Ford refused, allegedly telling Craig: "You get nothing from me, because you like to file grievances on people."

### C. Legal Mail/Law Library Access

Most of Craig's complaint concerns issues with his legal mail and what he believes is a denial of access to the courts. On April 23, 2025, he received an order from the United States Court of Appeals for the Third Circuit, allegedly instructing him to provide certain documents by April 28. Before he could arrange for a guard to sign the "cash slip" required to mail the documents, he was escorted to the RHU pending investigation

of the kitchen job dispute described above. Craig tried to explain the urgency of his legal mail and requested that the escorting guards sign the cash slips, but they all refused, and Craig was taken to the RHU without his legal property.

On April 27, Craig tried to send another mailing to the Third Circuit. An officer, John Doe #8, told Craig he was not authorized to sign cash slips, but he could collect mail later in the day and give it to another officer to sign the cash slip. However, this second officer left for the evening before signing Craig's cash slip. The following day, Craig left the mailing in his door sill, where it was collected by John Doe #10, and "processed" by Jane Doe #2, a mailroom employee. However, Craig never received a receipt for the cash slip, and he "discovered that staff could not ascertain the whereabouts" of his mailing, which was apparently never sent. Craig alleges that the appellate case "was closed and [he] was denied his due remedy, [which] he is confident he would have received had the Court heard his meritorious appellate claims."[3]

---

[3] The Court's review indicates that the case in the Third Circuit is *Craig v. Harry*, No. 25-1690 (3d Cir., docketed Apr. 14, 2025). The docket of that case indicates that Craig's appeal was dismissed on June 24, 2025, for his failure to pay the filing fee. After the dismissal, Craig filed motions
*(continued on next page)*

Craig also attempted to mail a motion for a state criminal appeal. *See Commonwealth v. Craig*, No. 1101 WDA 2023 (Pa. Super. Ct.). Another officer, John Doe #1, refused to sign Craig's cash slip, claiming that he did not have the authority to do so. Craig agreed for the officer to pass the envelope to another officer, John Doe #2, who would sign the cash slip and send the mailing. However, the mailing was ultimately returned to Craig by a mailroom employee, Jane Doe #1, on May 24, 2025, with the cash slip unsigned. At this point, another guard signed the cash slip, backdated it to May 11, and placed it in the mailbox. Craig alleges that because of the resulting delay, the Pennsylvania Superior Court denied his "Motion for Reargument" as time-barred.

In June 2025, Craig was transferred to Smithfield, where he encountered more issues with outgoing mail. At prior prisons, Craig had retained copies of signed cash slips in case he needed to demonstrate to a court that a delayed mailing was timely.[4] However, at Smithfield,

---

to reopen the appeal and to proceed *in forma pauperis*, premised in part on the alleged mailing delays. The docket indicates that these motions remain pending.

[4] Under the "prison mailbox rule" applicable in Pennsylvania courts and the courts of this circuit, "a *pro se* prisoner's legal documents are

*(continued on next page)*

defendant John Doe #38 "claimed that it was against PADOC policy to allow residents to possess any document bearing the signature of a guard." Craig complained to prison staff and received conflicting responses. However, defendant Miller allegedly "stated that he won't give any prisoner his signature, nor allow the guards under him to do so . . . as the guard who sorts the mail arriving on [Craig's] unit[,] he would do whatever is in his power to prevent [Craig] from getting signed Cash Slips."

Craig allegedly "won a grievance" about this issue, which permitted him to obtain signed cash slips. He requested two such cash slips in June and July 2025. However, Miller allegedly redacted the signature on one of the slips and confiscated another slip before it could be delivered to Craig. Miller claimed that he had obtained permission from defendant Gladfelter to "deface" the cash slips, which Miller allegedly sought because he was "displeased" by Craig's grievance. Craig alleges that

---

considered filed on the date that they're tendered to prison staff in accordance with reasonable prison policies, regardless of whether they are ultimately mailed." *See Webb v. Dep't of Just.*, 117 F.4th 560, 566 (3d Cir. 2024) (quotation omitted); *Commonwealth v. Little*, 716 A.2d 1287, 1289 (Pa. Super. Ct. 1998).

unnamed guards confiscated at least one other cash slip from a mailing dated August 4, 2025.

Craig alleges that he suffered retaliation because of his cash slip disputes. On August 5, 2025, his yard time was cut short by defendant Clemens, nominally because Craig's "sleeves were rolled up in the main yard." When Craig protested, Clemens allegedly put his "hand on his mace can in a threatening manner," and said: "I'll show you some OC spray if you don't lock in your cell . . . [N]ow that you have some idle time on your hands, you can start to withdraw all those grievances." Craig further alleges that in response to his cash slip issues, "the mailroom staff began to charge [him] extra postage for all his legal mail." The complaint is unclear on this point, but he seems to allege that mailroom staff improperly treated his envelopes as overweight mailings because he "could not prove how many sheets of paper were in the envelope." Craig alleges that defendant Grassmyer "admitted that her staff shouldn't have charged him" because Craig should have had access to complimentary envelopes.

Finally, Craig alleges that he was denied access to the law library four times between August and October 2025, despite being on the

"library list" or having a library pass. After one such denial, Craig asked why he was being refused access, and defendant Adams allegedly "stated that it was . . . 'because [you] are a d*ckhead who likes to file grievances and quote policy.'" Craig filed a grievance about the issue, attaching documentation of upcoming litigation deadlines, which allegedly should have "guarantee[d Craig] priority access." After Craig's grievance, defendant Pyo allegedly "directed the librarians to discontinue" issuing litigation deadline forms, meaning that upcoming deadlines would no longer entitle an inmate to priority law library access.

## II.  LEGAL STANDARDS

Under 28 U.S.C. § 1915A, the Court is obligated to screen any civil complaint in which a prisoner seeks redress from a governmental entity or an officer or employee of a governmental entity. 28 U.S.C. § 1915A; *James v. Pa. Dep't of Corr.*, 230 Fed. App'x 195, 197 (3d Cir. 2007). The Court has a similar obligation with respect to actions brought *in forma pauperis* and actions concerning prison conditions. *See* 28 U.S.C. § 1915(e)(2)(B)(i); id. § 1915(e)(2)(B)(ii); 42 U.S.C. § 1997e(c)(1); *see generally Banks v. Cty. of Allegheny*, 568 F. Supp. 2d 579, 587-89 (W.D. Pa. 2008) (summarizing prisoner litigation screening procedures and

standards).

The legal standard for dismissing a complaint for failure to state a claim under § 1915A(b)(1), § 1915(e)(2)(B)(ii), or § 1997e(c) is the same as that for dismissing a complaint pursuant to Rule 12(b)(6). *Brodzki v. Tribune Co.*, 481 Fed. App'x 705, 706 (3d Cir. 2012) (per curiam); *Mitchell v. Dodrill*, 696 F. Supp. 2d 454, 471 (M.D. Pa. 2010); *Banks*, 568 F. Supp. 2d at 588. "Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds the plaintiff's claims lack facial plausibility." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). In deciding the motion, the Court may consider the facts alleged on the face of the complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Although the Court must accept the fact allegations in the complaint as true, it is not compelled to accept "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d

160, 165 (3d Cir. 2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007)).

Craig asserts claims under 42 U.S.C. § 1983. Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. To establish a Section 1983 claim, a plaintiff must establish that the defendants, acting under color of state law, deprived the plaintiff of a right secured by the United States Constitution. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995). To avoid dismissal for failure to state a claim, a civil rights complaint must state the conduct, time, place, and persons responsible for the alleged violations. *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005). Further, "[c]ivil rights claims cannot be premised on a theory of *respondeat superior*. Rather, each named defendant must be shown . . . to have been personally involved in the events or occurrences which underlie a claim."

*Millbrook v. United States*, 8 F. Supp. 3d 601, 613 (M.D. Pa. 2014)

(citation omitted). As explained by the Third Circuit Court of Appeals:

> A defendant in a civil rights action must have personal involvement in the alleged wrongs . . . . [P]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity.

*Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

## III.   DISCUSSION

### A. Legal Mail Claims

Craig alleges that 25 defendants violated his First Amendment rights by "(1) failing to (timely) post his legal papers and/or (2) preventing him from documenting prison mailbox rule deadlines." To claim a denial of access to the courts, the plaintiff must allege "(1) that they suffered an 'actual injury'—that they lost a chance to pursue a 'nonfrivolous' or 'arguable' underlying claim; and (2) that they have no other 'remedy that may be awarded as recompense' for the lost claim other than in the present denial of access suit." *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008) (quoting *Christopher v. Harbury*, 536 U.S. 403, 415 (2002)). The complaint must "describe the underlying claim well enough to show that it is more than mere hope." *Monroe*, 536 F.3d at 205-06.

Craig has not met this standard. The allegation that his claims were rejected as untimely does not show that they were nonfrivolous, nor does his statement that he was "confident" in his own claims. Further, the fact that Craig has requested relief from dismissal from the Third Circuit based on these mailing issues (*see* n.3, *infra*) belies any inference that there is "no other remedy" available to him for that lost claim. As for his state criminal case, the Court's review indicates that he is referring to an appeal of the August 23, 2023, dismissal of an untimely PCRA petition. *See Commonwealth v. Craig*, No. 1101 WDA 2023, 2025 WL 1220306 (Pa. Super. Ct. Apr. 28, 2025). The Superior Court determined that in his petition, "Craig failed to allege, let alone prove, any exceptions to the PCRA's one-year time bar." 2025 WL 1220306, at *3.[5] This provides no basis to infer that he lost a non-frivolous claim because of mailing delays in requesting reargument.

However, separately from the right of access to the courts or any lost legal claim, a prisoner has the First Amendment right to send and

---

[5] The Court may take judicial notice of the orders in Craig's cases as evidence of "what the filings state, but not the truth of what was stated in those filings." *See Cap. BlueCross v. Atl. Speciality Ins. Co.*, No. 1:20-CV-02299, 2025 WL 1126544, at *1 (M.D. Pa. Apr. 14, 2025).

receive legal mail, subject to legitimate penological restrictions. *See Jones v. Brown*, 461 F.3d 353, 359 (3d Cir. 2006); *Taylor v. Oney*, 196 F. App'x 126, 128 (3d Cir. 2006). While isolated instances of lost or delayed mail do not state a constitutional claim, a pattern or practice of "interference," including "stolen" mail or unreasonable delays, may be actionable. *See, e.g., Spann v. Supreme Ct. of Pennsylvania*, No. 23-CV-1566, 2023 WL 4684909, at *6 (E.D. Pa. July 21, 2023); *Maddox v. Mendoza*, No. 22-CV-938, 2022 WL 1785451, at *2-4 (D.N.J. June 1, 2022); *Smalls v. Williams*, No. 21-CV-0891, 2021 WL 1313392, at *3 (E.D. Pa. Apr. 8, 2021).

Craig has not plausibly alleged that the two delayed mailings from Benner were the result of a "pattern or practice" of interference with his mail.[6] However, his allegations suggest a plausible claim against Miller, who confiscated or tampered with his cash slips, and Gladfelter, who

---

[6] Although Craig complains about various guards' refusal to sign his cash slips on demand, he has no constitutional right to dictate who signs his cash slips. Rather, any actionable "interference" would have come from staff allegedly mishandling mail that was in their control. Craig's descriptions of these two incidents at Benner, which involved different guards, do not plausibly suggest a pattern or practice of interference. *See, e.g., Castillo v. All Jane/John Does*, No. 3:15-CV-00910, 2016 WL 6089853, at *4-6 (M.D. Pa. Sept. 20, 2016).

allegedly gave Miller "permission" to do so.[7] The complaint also asserts a plausible claim against Grassmyer, the "Mailroom Supervisor," for enforcing a policy of deliberately overcharging for postage.

## B. Retaliation

Craig asserts retaliation claims, in various forms, against most of the 77 defendants. To state a prima facie case of First Amendment retaliation, a plaintiff must show that (1) he was engaged in constitutionally protected conduct, (2) he suffered an "adverse action" by prison officials sufficient to deter a person of ordinary firmness from exercising his First Amendment rights, and (3) the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take the adverse action. *Wisniewski v. Fisher*, 857 F.3d 152, 156 (3d Cir. 2017) (quoting *Newman v. Beard*, 617 F.3d 775, 781 (3d Cir. 2010)).

"[T]he filing of grievances and lawsuits against prison officials constitutes constitutionally protected activity" for purposes of a retaliation claim. *See Mearin v. Vidonish*, 450 F. App'x 100, 102 (3d Cir.

---

[7] Allegations that various other defendants expressed disapproval of Craig's arguments about cash slips, or participated in a single instance of mishandled mail, are insufficient. To the extent discovery reveals other defendants who were personally involved in the alleged pattern or practice, Craig may seek leave to amend the complaint.

2011). Causation can be shown through "unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action," or "a pattern of antagonism coupled with timing to establish a causal link." *Watson v. Rozum*, 834 F.3d 417, 424 (3d Cir. 2016). In some cases, causation can be established "from the evidence gleaned from the record as a whole." *Id.*

By these standards, Craig has asserted viable retaliation claims against Harper, who allegedly sent him to the RHU in the immediate aftermath of his kitchen job grievance; Miller, who allegedly interfered with Craig's cash slips because he was "displeased" with his related grievance; and Adams, who allegedly denied Craig law library access[8]

---

[8] Craig's vague allegations that other defendants "were implicated" in the denial of law library access, "failed to send" him to the library, or "took no corrective action" are insufficient, without allegations showing how those defendants were responsible for ensuring his library access. *See Rode*, 845 F.2d at 1207 ("Allegations of participation or actual knowledge and acquiescence . . . must be made with appropriate particularity."). The change in the policies for "priority" law library access is not an adverse action, absent specific allegations that Craig suffered "meaningful prejudice" in his legal claims from the delayed access. *See Williams v. Nyberg*, No. 1:20-CV-00208-SPB, 2023 WL 4628378, at *5 (W.D. Pa. May 10, 2023), report and recommendation adopted, 2023 WL 4628402 (W.D. Pa. July 19, 2023), vacated in part on other grounds, No. 23-2385, 2026 WL 396436 (3d Cir. Feb. 12, 2026).

because of his grievances.

However, Craig states no other viable retaliation claims. Most of the defendants for these claims are named because they allegedly endorsed or acquiesced in other officers' actions against him and Craig believes the defendants should have intervened. Even accepting Craig's allegations as true, that is no basis for a retaliation claim, because the complaint does not explain how their failure to intervene was motivated by his grievances. The fact that he has complained and filed grievances in prison does not transform every disputed action or decision of prison staff into "retaliation."[9] *See, e.g.,* *Smith v. Price*, No. 3:11-CV-1581, 2012 WL 6541008, at \*17 (M.D. Pa. Nov. 21, 2012) (complaint reflected "a preternatural, global, subjective sensitivity to alleged retaliation, with [the plaintiff] ascribing some retaliatory motive to virtually every action that occurs at the prison"); *see also Nunez v. Wetzel*, No. 1:21-CV-01484,

---

[9] Craig asserts claims against various defendants for their failure to intervene in disputes about his kitchen job, RHU placement, and prison transfer, but does not plausibly explain how their decisions were motivated by his grievances. Similarly, the fact that he filed grievances about guards' inconsistent cash slip procedures does not plausibly indicate that those procedures were retaliation for his grievances, even if he believes the guards' reasoning were "contrived."

2023 WL 2385931, at *5 (M.D. Pa. Mar. 6, 2023) (in general, retaliation is not plausibly inferred if the alleged retaliator was not the target of the protected activity). For example, there is no plausible basis to infer that the prison's enforcement of its medication distribution or phlebotomy practices were in any way motivated by his grievances or complaints.[10]

Further, much of the alleged retaliation did not involve "adverse actions." Although unpleasant, the denial of an extra bar of soap on a single occasion, and the abbreviation of one session of yard time, are *de minimis* actions that cannot sustain retaliation claims. *See*, *e.g.*, *Sears v. Mooney*, No. 1:17-CV-50, 2019 WL 6726839, at *8 (M.D. Pa. Dec. 11, 2019) (listing cases involving the denial of soap, showers, and yard time). Threatening remarks and gestures, although deplorable, are also insufficient. *See Burgos v. Canino*, 358 F. App'x 302, 306-07 (3d Cir. 2009) ("Mere threats do not constitute retaliation."). Therefore, the retaliation claims will proceed against Harper, Miller, and Adams on the grounds described above, but all other retaliation claims will be dismissed.

---

[10] The allegation that Ford denied Craig medication when he "asked Ford if he was having a problem with the wicket" does not plausibly support a retaliation claim; it is unclear how Craig's comment was "seeking redress" in a way that could be construed as protected activity. *See Mack v. Warden Loretto FCI*, 839 F.3d 286, 298 (3d Cir. 2016).

## C. Misjoinder

The remainder of Craig's claims concern alleged deprivations of his religious practice and are not properly joined in this case. Claims against multiple defendants may be joined in the same action only if:

> (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
>
> (B) any question of law or fact common to all defendants will arise in the action.

Fed. R. Civ. P. 20(a)(2).[11] "Courts generally apply a case-by-case approach when considering whether the facts of several claims constitute . . . a series of transactions or occurrences." *Russell v. Chesapeake Appalachia, L.L.C.*, 305 F.R.D. 78, 81 (M.D. Pa. 2015) (citation omitted). A series of transactions or occurrences may involve "(1) many of the same factual issues; (2) the same factual and legal issues; or (3) offshoots of the same basic controversy between the parties." *See id.* (quoting *Xerox Corp. v. SCM Corp.*, 576 F.2d 1057, 1059 (3d Cir. 1978)). However, separate

---

[11] "Courts in this Circuit have found that 'the same series of transactions or occurrences prerequisite under Rule 20 essentially consumes the second requirement'" of a question of law or fact common to all joined parties. *Beckett v. Grant*, No. 1:18-CV-00329, 2018 WL 4354468, at *6 (M.D. Pa. Sept. 12, 2018) (quoting *Norwood Co. v. RLI Ins. Co.*, No. 01-6153, 2002 WL 523946 at *3 (E.D. Pa. Apr. 4, 2002)).

incidents involving the same prisoner do not necessarily involve the same series of transactions or occurrences. *See*, *e.g.*, *Stevens v. Andrews*, No. 3:25-CV-1878, 2026 WL 475920, at *2 (M.D. Pa. Feb. 19, 2026).

"Misjoinder is not a ground for dismissing an action." Fed. R. Civ. P. 21. Rather, a district court has two options for dealing with misjoined claims: to (1) "drop" misjoined claims from the case on "just terms," or (2) sever the claims into separate lawsuits. *See id.*; *DirecTV, Inc. v. Leto*, 467 F.3d 842, 845 (3d Cir. 2006). Upon review, we find that Craig's religious claims do not arise from the same series of transactions and occurrences as the other claims. Further, none of the defendants for his retaliation and legal mail claims would be viable defendants for his religious claims.[12] Therefore, the religious claims will be severed into a separate action, for which Craig must pay a separate filing fee. *See Zamichieli v. DelBalso*, No. 3:17-CV-1898, 2018 WL 3727416, at *2 (M.D. Pa. Aug. 6,

---

[12] Craig vaguely alleges that on two occasions, defendant Adams "denied [Craig] the ability to practice his religion by preventing him from attending religious services." (Doc. 1 at 13, ¶¶ 237, 238). Unlike with Adams's claimed denial of law library access, this conclusory allegation would be insufficient to sustain a claim. While the law library claim will proceed against Adams, there is no viable claim against him premised on the denial of religious services, and therefore no basis for the other religious claims to be litigated in the same action.

2018) (a prisoner cannot use misjoined claims "to circumvent the PLRA's filing fee requirements").

## IV.  CONCLUSION

For the reasons described above, Craig will proceed on First Amendment claims of interference with legal mail against Miller, Gladfelter, and Glassmyer, and First Amendment retaliation claims against Harper, Miller, and Adams. All other claims of retaliation and "interference [with the] right to petition government for redress of grievances" will be dismissed.

Craig's First Amendment free exercise claims, RLUIPA claims, and Fourteenth Amendment equal protection claims will be severed into a separate action. The Clerk will be directed to provide him with the new case number and a separate motion to proceed *in forma pauperis* in that case. If he completes this application, or pays the filing fee, those claims will be screened pursuant to 28 U.S.C. § 1915A. If he does not do so, the claims will be dismissed without prejudice.

An appropriate order follows.

Dated: June 3, 2026                    *s/Joseph F. Saporito, Jr.*
                                       JOSEPH F. SAPORITO, JR.
                                       United States District Judge